Paul STANFIELD and Marilee Reetz, Individually and Representing All Persons Composing the Class of All Ad Valorem Property Tax Payers of Polk County, Appellants,

v.

POLK COUNTY, Iowa, Appellee.

No. 91–951.

Supreme Court of Iowa.

Oct. 21, 1992.

Rehearing Denied Dec. 23, 1992, as Amended Jan. 6, 1993.

Terrence A. Hopkins, Thomas J. Logan, and Anne L. Clark, Hopkins & Huebner, P.C., Des Moines, for appellants.

William J. Koehn, Stanley J. Thompson, and Harlan D. Hockenberg, Davis, Hockenberg, Wine, Brown, Koehn & Shors, P.C., Des Moines, for appellee.

SCHULTZ, Justice.

This appeal presents issues concerning the legality of actions of the Polk County Board of Supervisors (Board) in using public funds to satisfy the terms of a lease-purchase agreement of the Prairie Meadows Horse Racing Track. In fact, payments under the agreement are used to satisfy industrial revenue bonds issued pursuant to Iowa Code chapter 419 for the purpose of financing the construction of the track.

Property taxpayers and residents Paul Stanfield and Marilee Reetz brought this equity action seeking to enjoin Polk County (county) from making payments under the agreement. Additionally, plaintiffs requested the court to certify the action as a class action on behalf of all county proper-

ty taxpayers. The district court certified the class as "those persons who are ad valorem taxpayers in Polk County, Iowa." The county raised the defenses of the statute of limitations and laches.

Both parties sought summary judgments. The parties submitted extensive stipulation of facts for the court's consideration. In 1991, the district court granted the county's motion for summary judgment and dismissed the case. The court rejected the county's defenses grounded on time bars and laches, but accepted the county's claim that it did not act illegally or in violation of the state constitution. Because we believe the trial court should have granted defendant summary judgment on its defense of the statute of limitations, we affirm.

■■■ This appeal is from the district court's rulings on the summary judgment motions in this equity case. The scope of review is whether genuine issues of material fact exist and whether the law was applied correctly. *Brown v. Monticello State Bank*, 360 N.W.2d 81, 84 (Iowa 1984). If under the entire record, the only conflict concerns the legal consequences flowing from undisputed facts, entry of summary judgment is proper. *Id.* We cannot find facts de novo in an equity case, even though each party contends no issue of fact remains for trial. *Lyon v. Willie*, 288 N.W.2d 884, 894 (Iowa 1980).

The impetus for a horse-racing track originated with a private group of citizens. They sought to have the race track funded by tax-exempt bonds. In May 1984, the Board conducted hearings and then adopted a resolution to issue $30,000,000 in revenue bonds; however, in July this amount was raised to $40,000,000. The bonds were to be used by Central Iowa Sports Facility Limited Partnership (Central) to build a horse-racing facility. The published notice of public hearing complied with chapter 419 by indicating that the bonds would be paid solely from the revenue of the project. The notice also indicated the bonds would never constitute an indebtedness of the county nor give rise to a pecuniary liability of the county or a

charge against its general credit for taxing powers. In August and November the Board voted to approve the bond issue and adopted a resolution to proceed with the facility at the present Altoona location.

The bonds were issued in December and the First Trust Company of St. Paul (Trustee) was named trustee for the repayment of the bonds. At the same time, the county executed an agreement to loan the proceeds from the sale of bonds to Central to be used for the construction of the track. When the time came to remarket the bonds they were not salable because Central could not obtain a permanent letter of credit. Various efforts were made to market the bonds without success.

In 1986, Racing Association of Central Iowa (RACI) succeeded Central. At RACI's suggestion, the Board appointed a citizen's committee (committee) to determine the feasibility of the successful construction and operation of the proposed track and its economic impact on the community. The committee recommended to the Board that the county support the track under a plan of ownership and financing which contemplated a publicly owned facility.

A lease-purchase agreement and a management agreement were drafted and forwarded to the county by attorneys for RACI. In November, these documents were sent to the county administrator. The lease-purchase agreement provided that the project was to be paid from the bonds and the county would not pay any of the costs. The administrator's financial advisors referred to these documents as "a form of credit support" and said "the County's role will be to act as a credit support of last resort," stating the agreement was to "provide a credit enhancement for the bonds...." The executed agreement recited that the intended purpose of the payment of rent by the county included payment of principal and premium, if any, and the interest on the bonds. Rent was not to exceed $4,000,000 per year, but this sum was to be credited by any payments made under the parties' operating agreement. In December 1986, the lease-purchase

agreement was negotiated after public hearing and approved by the board.

A favorable bond rating was given by Moody's in June 1987, citing the lease-purchase agreement. The Board amended the lease-purchase agreement to identify a fixed sum per year for rent. The amended sums were exactly equal to the annual principal and interest payments due on the bonds. The bonds were sold, and construction commenced.

The racing facility was finally completed in March 1989. Shortly thereafter, the track ran into cash-flow problems because most of its revenues were restricted to debt service payments. The county agreed to lend RACI funds as needed for operating cash-flow requirements and also provided RACI with an additional no-interest-line-of-credit. In November, the Trustee notified the county that the amount due under the lease-purchase agreement for that one-year period totaled $658,889.50.

The county has been making its payments directly to the Trustee under the lease-purchase agreement for the bondholders, using its general-tax fund. This same fund has been used to make loan payments for RACI's operating expenses. Believing that these payments are illegal, plaintiffs instituted this action seeking to declare the agreement illegal and to enjoin the county from making any further payments or making further advancements of funds under existing lines of credit. As previously indicated, the district court denied this relief.

The taxpayers appeal from this ruling urging (1) the county's shifting of the risk of loss from the industrial revenue bondholders to the county's taxpayers violated the legislative intent of chapter 419; (2) the district court erred in concluding that the expenditure of county funds from general tax revenue for the lease-purchase was not an issue before the court because the bondholders had not attempted to compel payments; (3) the district court failed to address the adequacy of the public notice for the lease-purchase; and (4) the lease-purchase agreement and line of credit given by the county violated article VII, section 1 and article VIII, section 3 of the Iowa Constitution prohibiting the State from lending its credit or assuming corporate debts and liabilities.

On cross-appeal the county argues the taxpayers' claims were barred by statute of limitations and laches. We first address the cross-appeal.

I. *Affirmative defenses.* The county raised two affirmative defenses. It claimed the benefit of the statute of limitations for challenging a bond issue and a lease-purchase agreement. It also urged plaintiffs should be barred by the doctrine of laches. The district court simply ruled that the county failed to establish its affirmative defenses.

The appropriate time periods are not in dispute. The bonds were issued by the county on December 27, 1984. Its action on the lease-purchase agreement was taken by the Board on December 23, 1986. Plaintiffs' lawsuit was filed on July 9, 1990.

The county first argues that the three-month limitation period for attacking the legality of the municipal and industrial bonds bars plaintiffs from bringing this action. *See* Iowa Code § 419.15. However, because plaintiffs do not seek to challenge the legality of the original issuance of the bonds, we conclude that the section 419.5 time-bar is not involved in this case.

■ The county's second claim concerns the timeliness of plaintiffs' challenge to the lease-purchase agreement. Under the facts of this case, both parties agree that Iowa Code section 331.301(10) authorizes the county to enter such agreements and Iowa Code section 331.443(2) prescribes the terms and procedures for such agreements and provides a time period in which to claim that the Board exceeded its authority. Section 331.443(2) provides in part:

Before the board may institute proceedings for [a lease-purchase agreement] for an essential county purpose, a notice of the proposed action, including a statement of the amount and purposes of the [lease purchase agreement], and the time and place of the meeting at which the board proposes to take action [on the

lease-purchase agreement], shall be published as provided in section 331.305. At the meeting, the board shall receive oral or written objections from any resident or property owner of the county. After all objections have been received and considered, the board, ... may take additional action [for entering a lease-purchase agreement] or abandon the proposal.... *Any resident or property owner of the county may appeal the decision of the board to take additional action to the district court of the county, within fifteen days after the additional action is taken, but the additional action of the board is final and conclusive unless the court finds that the board exceeded its authority.* The provisions of this subsection with respect to notice, hearing, and appeal, are in lieu of any other law.

(Emphasis added.)

Plaintiffs maintain the county failed to prove the fifteen-day limitation applied in this case. The bulk of this contention focuses on the adequacy of the notice of hearing required by section 331.443(2). The county published notice as follows:

Notice is hereby given pursuant to § 331.301 Subsection 10 of the Iowa Code, as amended, that a public hearing will be conducted before the Board of Supervisors of the County of Polk, Iowa (the "County"), in Room 120 at the Polk County Administrative Office Building in the City of Des Moines, Iowa at 9:30 a.m. on December 22, 1986, on the proposal of the County to enter into a lease purchase agreement with Racing Association of Central Iowa (the "Association") for certain real estate and improvements constituting a racetrack facility located on Adventureland Drive in the City of Altoona, Iowa immediately east of and adjacent to Adventureland Park, for a period of years and to pay annual rent therefor in accordance with lease purchase agreements now on file in the office of the Polk County Auditor.

All local residents and taxpayers who appear at the hearing shall be given an opportunity to express their views for or against the proposal to enter into the lease purchase agreement, and at the hearing, or any adjournment thereof, the Board of Supervisors of the County shall adopt a resolution determining whether or not to proceed with executing and delivering the lease and the sublease.

To support its insufficiency of notice claim, plaintiffs cite *Miller v. Warren County*, 285 N.W.2d 190 (Iowa 1979). In *Miller*, a claim for damages for a road closure, we held that a notice was insufficient to vest jurisdiction in the county because it did not inform the adjoining landowners of their right to claim damages and that their right would be lost if not presented prior to the hearing. *Id.* at 194. In this case, the notice informed the citizens and taxpayers of the general nature of the hearing and that they could attend the hearing and express their views. Furthermore, in *Miller*, the board of supervisors was acting in a judicial capacity. In that context, the lack of jurisdiction argument applied. In this case, the Board was holding a public hearing on a legislative matter regarding the lease-purchase agreement. We believe our holding in *Miller* inapposite to this situation.

Plaintiffs also cite language from *Grove v. City of Des Moines*, 280 N.W.2d 378 (Iowa 1979), indicating that the right of the public to appear and make its views known is lost if the council does not provide adequate information nor are the electors required to sift through documents at city hall to find information the notices must contain. *Id.* 386–87. The *Grove* case involves a statutory appeal from the issuance of revenue bonds by a city. While we held the city exceeded its authority and acted illegally by joining two projects in its procedure, we did not address the matter of jurisdiction of the city to act or the statutory time-limit to appeal. *Id.* at 386–89.

We cannot agree with plaintiffs' assertions that the claimed deficiency in the notice deprives the county of all authority to act rendering the lease-purchase agreement void. Plaintiffs cite *McPherson v. Foster Bros.*, 43 Iowa 48, 58 (1876), as authority for the proposition that an act of a municipality done in an attempt to exercise power not possessed by it is void. In

this case, the county had statutory authority to enter into lease-purchase agreements. Furthermore, a statutory limitation period was not in place and was not an issue in *McPherson*. Later, in *Waller v. Pritchard*, 201 Iowa 1364, 202 N.W. 770 (1925), a taxpayer suit challenging the issuance of bonds on grounds the contract was void as a result of collusive behavior, we denied relief by applying a three-month statute of limitation for contesting the bonds. *Id.* at 1372, 202 N.W. at 774. We stated "[t]he very purpose of a statute of limitation is to cure imperfection and to give repose against litigation." *Id.* at 1372, 202 N.W. at 774. This reasoning is equally applicable to this case.

▇▇▇ Plaintiffs use a standard of "strict compliance" with notice provisions in arguing that the county failed to give adequate notice of the hearing and thus, did not have jurisdiction to act. We agree with the county that in reviewing the notice, we must apply the substantial compliance standard. In *Green v. City of Cascade*, 231 N.W.2d 882 (Iowa 1975), a case involving the validity of municipal general obligation bonds issued by a city, we stated the standard is substantial compliance. *Id.* at 885. Because the authority of the county to enter into a lease-purchase agreement is prescribed by the same procedures and notice required under a general obligation bond, we believe the same standard of substantial compliance is applicable. "Substantial compliance" means compliance to the extent necessary to assure that the reasonable objectives of the statute are met. *Superior/Ideal v. Oskaloosa Bd. of Review*, 419 N.W.2d 405, 407 (Iowa 1988). We believe that the notice in question notified the would-be objectors that the county was considering a proposal to enter a lease-purchase agreement and that they could voice their support or opposition to the proposal. We conclude that the Board's notice substantially complied with the statute.

▇▇▇ Plaintiffs also claim that because the notice failed to meet constitutional requirements the taxpayers were excused from complying with the fifteen-day notice

of appeal. They urge that the notice violated the due process clause by failing to inform the affected parties, the taxpayers of the county, of the true nature of the project. They cite *Mammel v. M & P Missouri River Levee Dist.*, 326 N.W.2d 299 (Iowa 1982), for the proposition that one of the elements of sufficient notice is that the "notice must inform affected parties of the nature of the project." *Id.* at 302. Elsewhere in their brief, plaintiffs urge that the notice should have apprised taxpayers that the true nature of lease-purchase agreement of the racetrack was to provide credit support so that the bonds could be marketed. While this may have served as an additional motivation for the Board to enter such an agreement, the clear terms of the agreement provide for a lease-purchase of the racetrack.

In summary, we reject plaintiffs' claim of a due process violation. We note that no challenge was made concerning the sufficiency of a fifteen-day notice. Consequently, such issue is waived.

Lastly, plaintiffs claim the time-period is inapplicable because the arrangement is merely a means of providing credit support for industrial bonds rather than a lease-purchase. We believe the present case is unlike *Bachtell v. City of Waterloo*, 200 N.W.2d 548 (Iowa 1972), cited by plaintiffs. In *Bachtell*, we determined the substance of a contract denominated as a lease constituted a transparent purchase agreement and was invalid. *Id.* at 551. *Bachtell* is not authority for the avoidance of a statutory limitation period. In this case, the agreement provides for periodic payments over time in return for ownership of the facility. The substance of the agreement is consistent with the denomination of the contract. For these reasons we reject this contention.

Section 331.443(2) provides a fifteen-day window of time wherein a resident or property owner of the county may appeal a decision of the Board and challenge it on the basis that the Board exceeded its authority. We spoke to the period allowed taxpayers to challenge the legality of a bond issue and stated "[T]he challenge to

the validity of bonds, which are about to be offered to innocent purchasers, should be made promptly if it is to be made at all." *Waller*, 201 Iowa at 1372, 202 N.W. at 774 (1925). We believe that this logic equally applies to the parties in a lease-purchase agreement.

The legislature plainly provided that the additional action of the Board "is final and conclusive" unless an appeal is taken within fifteen days and the court finds that the board exceeded its authority. § 331.443(2). It appears the legislature intended to provide a means to adding finality to contract negotiations in a relatively short time so that parties could proceed with the business at hand. This allows a taxpayer an opportunity to challenge the legality of the action, but closes the door when no challenge is made. This certainty should contribute to the economic considerations involved in the negotiations. To allow plaintiffs to open the door two years later, not only would fly in the face of the statute, but also would set off a chain of litigation, uncertainty and chaos well beyond the present action.

When we review the entire record, the undisputed facts show that plaintiffs' challenge was filed several years after the time period provided in section 331.443(2). We conclude that the county substantially complied with the notice requirements of such section. We hold that the county was entitled to summary judgment on its defense.

This ruling also disposes of the taxpayers' claim that the county should be enjoined from making further payments on the lease-purchase agreement. The action of the Board "is final and conclusive unless the court finds that the board exceeded its authority." § 331.443(2). Taxpayers cannot now challenge the legality of the lease-purchase agreement. Moreover, section 331.443(2) limits further challenge by providing that the "notice, hearing, and appeal, are in lieu of any other law." A failure to timely appeal bars the right, not merely the remedy. *See Harris v. Clinton Corn Processing Co.*, 360 N.W.2d 812, 817 (Iowa 1985). Consequently, the taxpayers may not challenge future payments.

We also reject taxpayers' claims of constitutional violations concerning loaning credit and assuming the debts of corporations. *See* Iowa Constitution Articles VII, § 1 and VIII, § 3. The advancement of money to RACI did not cause the county to loan its credit or assume the debts of RACI. *See Merchants' Union Barb-Wire Co. v. Brown*, 64 Iowa 275, 20 N.W. 434 (1884).

We need not discuss the defense of laches or other matters relied upon by the trial court in dismissing this action. Our holding is consistent with the result of the district court's ruling.

AFFIRMED.

LAVORATO, J., takes no part.

All other Justices concur except HARRIS, J., who dissents and is joined by LARSON and SNELL, JJ.

HARRIS, Justice (dissenting).

The majority does not reach the merits of this important controversy because it concludes error was not preserved on plaintiff's response to defendant's affirmative defense of waiver. With all respect to the majority, I am convinced error was preserved and the defendant has failed to bear its burden to establish its affirmative defense. I therefore think the merits can and should be addressed.

On reaching the merits I would grant plaintiffs the relief they seek because I am convinced this crude scheme, which renders Polk County voters liable for what should be a private obligation, is illegal and unconstitutional.

I. The majority's threshold determination not to reach the merits rests on a twofold conclusion. The · majority finds that the fifteen-day notice of the transaction (1) substantially complied with Iowa Code section 331.443, and (2) was adequate to bar this action. Both findings strike me as dead wrong.

Section 331.443(2) demands that the public be informed of four things:

(1) the amount of the lease-purchase;

(2) the purpose of the lease-purchase;

(3) the time of the hearing; and

(4) the place of the hearing.

We have said such a notice is important and "should inform the public definitively about the proposal," and that the public should not be required to "ferret out information at city hall." *Grove v. City of Des Moines,* 280 N.W.2d 378, 386 (Iowa 1979). The notice in this case utterly fails to inform concerning the first and second of these required matters; the notice in fact appears to have been calculated to camouflage both the extent and the purpose of the undertaking. I am dismayed by the majority's finding of substantial compliance.

Of the four matters of required information, the amount involved in the so-called lease-purchase is mentioned first in the statute. Although the precise amount could not be fixed at the time the notice was published, the maximum amount was known. The extent of the risk was the matter perhaps most likely to arouse public interest. There can be no valid excuse for secreting it from the public.

The notice also succeeded in hiding any information about the real purpose of the agreement. Those publishing the notice had abundant information concerning that purpose, all of it damning. Under any fair reading of the record the purpose was to set up the taxpayers as the principal source of security for the bonds in order to market them, a matter I shall later explain in more detail. The bonds were obviously more attractive to prospective bondholders when the entire risk shifted from them to Polk County's resident taxpayers. Yet the notice was drafted to appear only as an innocuous proposal by the county to enter a routine lease-purchase agreement.

Defendant's assertion that it gave the required notice should also fail on a constitutional claim advanced by plaintiffs in their resistance to defendant's motion to dismiss and for summary judgment. Plaintiffs asserted the notice was constitutionally deficient on the basis of *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed.

865, 873 (1950), which they quoted as follows:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

(Citations omitted.) *See also Mammel v. M & P Missouri River Levee Dist.,* 326 N.W.2d 299, 301 (Iowa 1982).

Plaintiffs were indeed denied due process on the basis of the notice's infirmities previously mentioned. The due process challenge is greatly strengthened when the inadequacy of the statutory fifteen-day period is considered. Fifteen days does not allow a reasonable time for taxpayers to react to a proper notice, much less this skimpy and misleading notice. In *Miller v. Boone County Hospital,* 394 N.W.2d 776, 781 (Iowa 1986), we used an equal protection analysis to strike down a statutory sixty-day notice requirement aimed at tort victims who were fully aware of their injuries. There is considerably less justification for a fifteen-day requirement for unnamed taxpayers who have yet to learn they have been financially hurt by a carefully veiled scheme.

The majority is mistaken when it reaches out for a finding of substantial compliance with the notice requirements. For all practical purposes there was no compliance. The majority is also mistaken in rejecting the constitutional challenge to the notice.

II. Although the majority is prevented by its holding from sharing its views on the merits, it is appropriate for me to state mine. Misguided public spirit may have deluded the county officials and prompted them to enter this arrangement. Even so, the plan itself was an outrage and in flagrant violation of Iowa Code chapter 419, the chapter that grants general authority to issue bonds for construction of a number

of public projects, including race tracks. This authority does not extend to assessing the taxpayers for costs of the project; the legislature contemplated that the bonds were to be paid solely from the project's own revenue-generating ability. The statute could scarcely be more clear. The bonds "shall never constitute an indebtedness of the municipality [in this case county] ... and shall not constitute nor give rise to a pecuniary liability of the municipality or a charge against its general credit or taxing powers." Iowa Code § 419.3(1).

How then was this prohibited result achieved? We are told to look at legal steps, in isolation and only one at a time. The steps included a bond issuance, a loan of bond proceeds, and a lease-purchase agreement, steps said to be individually in compliance with Iowa Code sections 419.-2(5), 419.2(4), and 419.2(1). But these steps were taken together for purposes of a single project. Taken together they violate Iowa Code section 419.3(1) which demands that the bonds be paid "solely out of the revenues derived from the project...." In other words, defendant would have us pretend an illegal act is rendered legal if it can be achieved by separate acts, each one of which are said to be legal if considered only in isolation.

Assuming the individual steps to be legal,[1] the statutory scheme would authorize no more than the following arrangement. The bondholders would finance the construction of Prairie Meadows, but Polk County would own it. Under an authorized financing arrangement bondholders would suffer the risk that Prairie Meadows might not be sufficiently profitable to allow recoupment of their investment. The taxpayers would invest no money in Prairie Meadows but would benefit from any Prairie Meadows revenues beyond those necessary to repay the bondholders and to pay RACI for its operation of the track.

The actual arrangement under challenge in this litigation was far different. There were two transactions. First, the county loaned the bond revenues to RACI, allowing RACI to build, own and operate Prairie Meadows, subject only to its bond repayment obligations. Second, under the lease-purchase agreement the taxpayers, by way of the county's general tax fund, are purchasing Prairie Meadows over time from RACI. The taxpayers' payments under the lease-purchase agreement are exactly equal to RACI's bond repayment obligations. The lease-purchase payments were obviously structured to satisfy RACI's bond debts, allowing RACI to pocket any revenues from operation of Prairie Meadows. The lease itself states that the intended purpose of the rent includes the payment of principal and interest on the bonds.

Superficially the challenged plan might appear similar to the authorized one I have described. This is because, either way, the county ends up owning the race track and RACI is receiving payment for operating it. But the differences are crucial. Under an authorized plan the bondholders would supply funds to the county for construction and ownership of the track. And because, under Iowa Code section 419.3(1), the county's bond repayment obligation can be le-

---

1. Such an assumption is flawed for a reason outside the issues drawn by the litigants. At least one key step is flagrantly illegal. That key step depends on definitions of "lessee" and "contracting party" in § 419.3(1) ("The principal of and interest on such bonds shall be payable solely out of the revenues derived from the project to be financed by the bonds so issued under the provisions of this chapter including debt obligations of the *lessee or contracting party* obtained from or in connection with the financing of a project." (Emphasis added.)). The county's claim of authority is derived from this language.

   Although the county must purport to be either lessee or contracting party in order to be autho-

rized under this provision, it in fact qualifies as neither. The statutory definition of "lessee," under § 419.1(6), includes only single persons, firms and corporations. The county is none of these, obviously not a single person or firm, and cannot be a corporation under the definition of "corporation" in § 419.1(13) (profit or nonprofit corporation "for which the secretary of state has issued a certificate of incorporation or a permit for the transaction of business ..."). Neither can the county qualify as a "contracting party" under § 419.3(1). Section 419.1(10) defines a contracting party as "any party to a sale contract or loan agreement *except the municipality*." (Emphasis added.) Polk County plainly is excluded by these definitions from drawing the authorization it claims from § 419.3(1).

gally satisfied only with revenues from Prairie Meadows, the bondholders would incur the risk that the race track will not be sufficiently profitable for them to recoup their investment. Under the actual plan, however, the taxpayers supply the funds for the county's purchase of Prairie Meadows and in so doing the burden of risk shifts from the bondholders to the taxpayers. This is true because:

(1) The taxpayers, by way of their payments under the lease-purchase agreement, guarantee the satisfaction of RACI's bond repayment obligations;

(2) The taxpayers have infused funds sufficient to satisfy the bond obligations into Prairie Meadows, which would not have been done under an authorized plan;

(3) The taxpayers, not being bondholders, cannot personally recoup anything repaid on their investments; and

(4) Upon failure of the race track, the bondholders cannot lose because the taxpayers, as sole riskbearers and guarantors of the bonds, will suffer any financial loss resulting from their continued payments under the lease-purchase agreement. While the taxpayers pay any loss, the bondholders will continue to profit from their investment.

Further payments under the lease-purchase agreement should be enjoined.

III. As a political subdivision of the state, Polk County is also subject to section I article VII of the Iowa Constitution:

> The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation; and the state shall never assume, or become responsible for, the debts or liabilities of any individual, association, or corporation, unless incurred in time of war for the benefit of the state.

We have never been called upon to apply this provision to counties, but I cannot imagine any serious contention a county can pledge what the state cannot. Other states apply similar provisions to political subdivisions. *Myers v. County of Cook*, 34 Ill.2d 541, 542, 216 N.E.2d 803, 804 (1966); *State v. City of York*, 164 Neb. 223, 225, 82

N.W.2d 269, 271 (1957). We defined "credit" in *Grout v. Kendall*, 195 Iowa 467, 472, 192 N.W. 529, 531 (1923) (secondary liability will become primary upon failure of primary debtor). The plan here was designed for the specific purpose of implicating the public's credit and was therefore plainly unconstitutional.

I would reverse, enjoining any further payments under the lease-purchase agreement and enjoining any further extension of credit.

LARSON and SNELL, JJ., join this dissent.